I am pleased to report Jared Tyler, your appellant towards McFarland, an extreme malfunction in Texas' criminal justice system. Although the prosecution's case against Mr. McFarland was based on unreliable evidence, this conviction was obtained due to multiple constitutional violations, including a denial of his right to counsel in the prosecution's withholding of evidence that would have rebutted one of its two critical witnesses. Because the weakness of the state's case against Mr. McFarland is relevant to issues in the appeal, I will briefly touch upon that first. I then plan to address issues 1 and 4 in the brief, those being the chronic and Brady allegations, and touching on issue 3 if time permits. Upon being charged with capital murder, Mr. McFarland maintained his innocence and denied being present or having involvement in the offense. No physical evidence connected him to the crime. The state relied on just two pieces of evidence to support the charge. Both of which are known today to be highly unreliable. First, the state relied on a witness, Craig Burks, who testified that Mr. McFarland had admitted his involvement in the robbery to him on the night that it happened. In exchange for testifying against Mr. McFarland, that witness had been given a favorable deal on his unrelated aggravated robbery charge. An unknown to Mr. McFarland's jury, a witness whom Burks had placed with him when Mr. McFarland allegedly made the admissions, had testified in grand jury proceedings before the trial that no such admission had ever occurred. After trial, the witness recanted his trial testimony in a sworn statement. Second, the state relied on a stranger eyewitness identification from a witness who only briefly saw the events while parked in her car. That witness, an employee of the law enforcement agency investigating the case, had told the police on the day of that everything had happened so quickly she did not believe that she would be able to identify anybody involved. And also unknown to Mr. McFarland's jury, she had given a general description of the person that she would later identify as Mr. McFarland that was not consistent with his physical appearance. She described the person's height as being between 5'7 and 5'8 and Mr. McFarland is over 6 feet tall. The entirety of the state's case against Mr. McFarland rested on these two slivers of evidence, causing the district court below to observe that it was not an indefensible case for him. Turning to the chronic claim, Mr. McFarland has raised an unusual chronic claim because to an observer, he would have appeared to have had two lawyers representing him at his trial. Yet, one of those lawyers had accepted the representation despite not being competent to do so, profoundly neglected the case after accepting the representation, and was physically unconscious at counsel's table, sleeping during much of the trial. The other lawyer was inserted into the case by the trial court without Mr. McFarland's consent and after he had retained his counsel of choice and acted under court-imposed constraints, handcuffing him to the negligent counsel and preventing him from exercising judgment as Mr. McFarland's lawyer within the meaning of the Sixth Amendment. The result was that Mr. McFarland was convicted of capital murder and sentenced to death based upon unreliable and dubious evidence that went insufficiently challenged. The district court below denied Mr. McFarland's claim, but it committed a reversible legal error by failing to recognize that the state court had applied a rule contrary to chronic or that his decision involved an unreasonable application of it. Chronic identified three situations in which counsel is deemed actually or constructively denied. First is when the accused has denied the presence of counsel at a critical stage. Second is when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing. Counsel, you understand the standard better than I am sure. We are looking at applying effort to what the state courts have already done with these cases. The court of criminal appeals dealt with that, dealt with it specifically in terms of chronic and said that this person was not without counsel. Your client, McFarland, was not without counsel. These arguments have been presented and this particular argument is presented and dealt with. What specifically is wrong on the effort with what has already been decided on this issue in state court? Not what Judge Hughes did with it, but what the court of criminal appeals and the state habeas court trial court did with it. Sure. So the state court in its decision agreed that retained counsel's absence in himself from a large portion of the proceedings by sleeping. It specifically reevaluated its prior decision in light of this court's en bloc decision in Burdine. But the state court nevertheless denied relief on the claim by pointing to the second lawyer's presence at the trial and reasoning that the active presence of the second lawyer meant a chronic violation. Well, I looked at the evidence on that. It does seem to me that Mellon, Mellon, Mellon, whatever his name is, cross examined or questioned witnesses. I will say some of what said he came up with a strategy for the case. It's kind of hard to know how that strategy implicated anything if Ben wasn't talking to him. But he was involved in the case. Was he not? Did he take some witnesses? Wasn't he at the table to the extent Ben was asleep? You like the word unconscious, but regardless was not participating, able to participate. Mellon was there. Do you have any evidence from the transcript otherwise of what actually happened that nobody responded to that a conscious attorney would have? I mean, it does seem to me that for all the good things you have, those have been dealt with in a way that is not frivolous by the state court. Yes, and I think that that's what the third chronic test in particular is meant to address. So the question is, the state court seems to hold that chronic is not legally available if counsel is always present. But the third chronic test actually presumes the presence of counsel. And so the question is not whether counsel is present. It's whether the circumstances under which that lawyer is operating are such that no attorney, even a competent one, could be expected to reasonably provide effective representation. Well, if you could show me at least that this backup counsel wasn't able to do anything, that would be one thing. But what I understand from the record is he did do a variety of things at trial. So it's not as if, as you say, on the third step of this or whatever, that it's as if nobody was there assisting McFarland. Sure, and we're talking about constructive denial here. And what the third chronic test looks at specifically is not what the lawyer was able to do, notwithstanding whatever constraints are imposed on that lawyer. It looks at the constraints themselves and asks, could any lawyer be expected to provide effective representation under these constraints? So it's the fact that a lawyer is able to navigate constraints in a particular case is not relevant to that third test. And in fact, the chronic decision itself would be a model to look at, because that opinion actually is a decision applying the third test. And all it's looking at—well, I should say first that that case is a one-lawyer case. There's no dispute that the lawyer in that case is preparing for that case, is representing the client throughout the entire trial. But that does not factor into the chronic analysis that the court undertakes in that case. It's looking at the circumstances to determine whether any lawyer could provide effective representation. Now, the defendant loses, of course, in chronic under those circumstances. Can you point to some specific deficit in the performance? Deficits in the performance? Yes. Well, that gets into the Strickland claim, I think. And his preparation, I think—you know, he was able, through the constraints, I think, to file some motions. He did get an investigator. But he does not use that investigator to interview any known witnesses to him, including the eyewitnesses or witnesses that should have been known to him relevant to Craig Burks' story about Mr. McFarland's alleged omission. So no witnesses are ultimately interviewed, despite the fact that he managed to get an investigator through the constraints. Of course, at all times, he's operating without any authority to make independent decisions. So his autonomy to actually effectuate the means of this representation is sharply limited. And that might explain, essentially, why the investigation that he manages to at least kind of, you know, formulate does not really get executed in any meaningful way. When he goes into the trial, his knowledge base is the state's file and nothing more, which is the same as retained counsel's knowledge base. One of the things—occurring opinions until 2005, I guess it was, Court of Appellation said that McFarland brought this on himself as the district trial judge. I don't know what extent Court of Appellation's concurring opinion said this, that the trial judge several times said, are you sure you want to keep Ben as the attorney? There's some back and forth in the briefing with you and your friend on the other side about whether he was really told, McFarland, that maybe this isn't a good lawyer. Are you sure you want to keep him? I don't see much case law on something like that, but that is a factor in this test, in this case, that your client brought this on himself. How does that factor into what we're looking at? Well, I don't think that it does for a couple of reasons. You know, the Supreme Court in Tyler has recognized— Let me ask you factually, are you taking the position that the trial judge never told Ben you really ought to be looking at another lawyer, or Ben's not the best lawyer, or at least it seems to me, I haven't seen any quotes in the transcript, but at least it was indicating, are you sure you want to keep Ben as your lawyer? As a factual matter, so all of this comes from the second lawyer, Melamed, who is testifying to this in the . . . There's nothing in the transcript of the trial . . . No, the trial record is completely silent about . . . There's never any question put to Mr. McFarland on the record about his counsel. Melamed testifies the judge asked—that's the second lawyer— Mr. McFarland two or three times, all before trial started, whether he wanted to stick with the retained counsel, and that Mr. McFarland said that he did. Now this is all before trial. It's at a point in time where Mr. McFarland is not really in a position, I think, to judge what his retained counsel is doing or not doing, but Melamed also said that specifically, there's testimony from Melamed, that Judge Shaver, the trial judge, was careful to avoid . . . What? That Judge Shaver, the trial court judge, was careful to avoid expressing his opinion about retained counsel to Mr. McFarland, and that comes directly from . . . Is there some indication of a relationship between McFarland and Ben? Why Ben? Is that in the record? No, that's not in the record. What should the trial judge have done? I think the trial judge, as the CCA state court recognized, was put in a difficult position the moment the retained counsel accepted this representation, and at that point he's faced with, well, I guess, three options. One is to do nothing and watch a Sixth Amendment violation happen. The judge appropriately thought that that was not the right solution. The other two options then were what he did here, which was appointing this counsel and limiting his authority and autonomy to act. And the third option, which I think was the only one that could have actually prevented a Sixth Amendment violation, was simply to remove John Ben. There appears to have been conflicting evidence about who the shooter was and, in particular, the incentives of the witness to point the finger at McFarland. Aquarian was a failure of this counsel to develop that. I thought he did that in the record. Well, it's . . . Was it a failure to call witnesses specifically? Not a failure to call. As to the facts of the crime, those were the witnesses. All the witnesses who testified were the witnesses to the case. There were no other witnesses that could testify in terms of the factual scenario of the offense. Now it's the retained counsel who actually examines the witness who identifies Mr. McFarland, and he does not elicit from her the inconsistent physical description that she gave to the police. Let me ask you about the Brady claim. I need you to tee it up for me a little bit. I looked at the findings and conclusions adopted by the Court of Criminal Appeals in 2004, I guess it was. The trial judge was in 2004. And the trial judge addresses Brady and may say three different things or may just base its conclusion on one thing, which is the grand jury testimony's hearsay. There's a conclusion later. I don't know if it applies to Brady, but maybe it does. Was the affidavit of Walter Burks in front of the trial judge when those findings were made? No, that affidavit was not in the state court record. The opinion is 04. The Court of Criminal Appeals is 05. This affidavit is November of 05. So how does this fit into our deliberations now? Isn't there a pinholster problem? How do we get to the evidence? All that the trial judge had adopted by the Court of Criminal Appeals in 04, 05 was the findings that we have to say violated their fact findings, that there was nothing there that was Brady material, nothing there that would have been helpful, whatever that was based on. And I can't tell from the findings what that was based on, but nonetheless we have them. And after all that, we get Walter Burks' affidavit that does create some sort of question. So how do we factor that in to the legitimacy of the 04, early 05 state court opinions? Sure, I think, so of course when the habeas petition is filed, those are the allegations that are made, and one of those allegations was the nondisclosure of the grand jury testimony. That grand jury testimony does, is in the state court record, and so there is . . . Burks' affidavit says it's a past tense exhibit, so . . . Oh, right, but it was also included, the grand jury testimony was part of the state court record, just the affidavit was not. It would have been in front of whoever the trial judge was in 04 when he was making these findings. The testimony? The grand jury testimony. Yes, yes. And, you know, the state court actually did not permit Mr. McFarlane to present evidence on the claim. It essentially held that there were no controverted facts about it. And so I, you know, one way to read this is as kind of an opinion as a matter of law. Treating the grand jury testimony as something that as a matter of law, the defense could not have done anything with. Because in the absence of giving him an opportunity to prove the merits of his claim with evidence, it's difficult to understand how the court could have resolved any factual disputes that it, you know, essentially held did not exist in the case, or were not necessary to resolve, I guess, in order to dispose of it. And as we're on the Brady claim, there's one thing I want to, did want to address about the district court opinion. And that is its finding, apparent finding that there was no evidence that the state had withheld the testimony at issue here. I think that finding is clearly erroneous, even just in light of the state court record. The state did not ever make a finding that the state had disclosed the material. An uncontroverted testimony from Melamed established that the grand jury testimony ordinarily is not in the state's file in Harris County. So in other words, the norm would be that the grand jury testimony is not in the file that's available. And that's because the testimony is generally confidential unless it's overridden by the higher Brady obligation to disclose. Now second, Melamed testified that he essentially verbatim copied the entire state's file that was made available to him as his notes. And he testified he extensively took notes of the state's file. And the district attorney even proposed, and the state court found, his extensive note-taking of the file to be a fact. What do you do with a Texas Court of Criminal Appeals treatment of the Brady claim? They said that Melamed claimed in his state habeas affidavit that he did not recall receiving Craig or Walter Burke's grand jury testimony. His trial notes include information from Craig Burke's grand jury testimony implying that he had access to Walter Burke's testimony. And I'm quoting, there is no evidence that the state withheld this evidence. In our present posture, how should we review that? I think it might depend on what that finding is meant to be doing in the district court's opinion, whether it's meant to be supporting its 2254D determination, in which case I think that that's just an improper analysis because it's not looking at the state court opinion. But to the extent it's an independent fact-finding in some way, then I think it's clearly erroneous. And in fact, the opposite inference is the one that should be drawn from the state court record. Melamed's notes— Well, that's their interpretation of the record. I'm sorry? That is the Texas Court of Criminal Appeals interpretation of reading of the record and the evidence itself. What difference would we give that? Well, I don't think the Texas Court of Criminal Appeals said anything about this. That was the district court opinion as I understand it. The Texas Court of Criminal Appeals adopted the trial court's findings of fact and conclusions of law. And those do not make any finding about whether or not disclosure had occurred in the case. So there is no—essentially there is no state court finding as I read the trial court's findings of fact and conclusions of law that disclosure of this testimony ever occurred. I think they found it essentially mooted by the hearsay reasoning. Well, I'm reading the footnote in the Court of Criminal Appeals 05 opinion. It talks about Brady. And in its writ findings, the trial court, which I imagine is the November—or the 04 finding by the trial court, the trial court concluded the applicant failed to show that Burke's grand jury testimony contained Brady evidence or that the state withheld the transcript of Burke's testimony. Also failed to show that admission of the grand jury testimony would have been favorable to applicants. I mean, they didn't need detail, but they're saying they need detail why each of those findings was made. But it was a finding by the court, state habeas court that we must overcome, you must, under EPA, that there's nothing to this Brady claim. So it wasn't withheld. It was actually a finding that was available. You would know this, I'm sure. But failed to show that his grand jury testimony contained Brady or that he withheld the transcript. You may have been talking about it earlier. It's one thing to say, are you saying his Brady material, it was potentially helpful to McFarland, and so it needed to be disclosed as opposed to just not being withheld? Yes, it definitely needed to be disclosed. This was that the grand jury testimony is something that only the state possesses. So Mr. McFarland's counsel would not have access to it otherwise unless it's disclosed. Now, the substance of it was a witness who was denying the account that the state's critical witness made about how Mr. McFarland admitted involvement in the crime to him. Mr. Woodburgs didn't say in his grand jury testimony that's really important to you as opposed to what he did say? You have this affidavit that said if I had been asked, here's what I would have said. I haven't looked at the grand jury testimony. Is there something in the grand jury testimony itself that is helpful to your client? Or is it really more the affidavit pointing out what's not in the testimony? No, it is the, what the grand jury testimony would have done is alerted Mr. McFarland to the existence of a witness who would have denied Craig Burks' narrative account of Mr. McFarland's alleged admission to him. That's still a step removed, it seems to me, in your careful explanation there. A step removed from what's in the testimony itself. That's correct. And the grand jury testimony, you know, could not have been used, at least directly. However, I would refer— Isn't that what the Court of Apprentice Bill is talking about, though? That there's nothing really Brady-like in that grand jury testimony? It's what it might have led to had Melamed and Elamed and Benden given it? Yeah, I think that, but I think that is the question, is what would it have led to? Not necessarily what could you— Are you agreeing with that? I'm sorry, that— Agreeing that it's not really what's in the testimony per se. It's what it could have led to had defense counsel had it. Yes, and— Is that Brady material? Yes. I think any—the Brady standard is, or the materiality standard, is a reasonable probability that the result would have been different had the information been disclosed. And so the court looks to what defense counsel would do with the information that's been disclosed. And in this case, the information was a witness statement that he— that Mr. McFarland had never made any admissions in front of him when the state's witness was claiming that those admissions were made in front of that very same witness. So it allowed—it would have allowed the defense counsel to secure testimony from that witness that would have then directly contradicted and refuted Craig Burks' testimony that Mr. McFarland had ever admitted involvement in the offense. All right, counsel. Thank you. You did have five more seconds, but I didn't think that was enough time to get going. Good morning, Your Honors. May it please the Court. McFarland's habeas claims, the founder on the shoals of Ed Pizzoli litigation bar, the CCA's resolution of McFarland's ineffective assistance of counsel claims, do not involve any unreasonable application of any claims. Likewise, the Sixth Amendment lineup claim involves no unreasonable application of any clearly established Supreme Court law and, if anything, clearly is consistent with the Supreme Court's decision in Rothkering. And finally, with respect to the Brady claim,  involve no unreasonable application of clearly established law and, for that reason, the Court should affirm the district court's denial of the habeas petition. Let me start you on chronic. The Court of Criminal Appeals said, found, maybe held or found, I'm not sure which, that—how are we pronouncing the second lawyer's name? Malamud, I believe. I'll go with it. That Malamud, the Court of Criminal Appeals found that Malamud's presence meant that chronic did not apply. And they did elaborate, not just that somebody else was sitting there, but that Malamud had enough of a role. I've looked at all the briefing. I haven't looked at any of the transcript, but it does seem to me that whatever Malamud did was really, there's a barrier between him and active participation, certainly in the preparation of the case and deciding what witnesses to call and whatever. There's also a limitation about a particularly, I'm saying as an issue economist, a very small investigation amount of money available to the defense. There are serious problems, it seems to me, in saying that Malamud was acting as any kind of second chair as opposed to having to fight Ben to do much of anything. How would you try to satisfy the court that there really was enough of discretion and opportunity to assist by Malamud to overcome the chronic problem? I'd say a couple things, Judge Southwick. The first is that the CCA found that Malamud was not paralyzed, I think in the words of Mr. McFarland, paralyzed by an officer. Unconscious Ben paralyzed Malamud. I understand why he's saying that. Yeah, well, the CCA found that these limitations, so to speak, were not really available, and I think the trial record does make clear that Mr. Ben didn't impede Mr. Malamud's defense in any way. In fact, Mr. Malamud conducted the whole trial virtually. I don't see any record in any evidence in the trial record suggesting that Mr. Ben overruled him in any way on any sort of decision. So I would disagree on that. Let's look at the mitigation case, which, to be charitable, was thin. And that's the be-all, end-all for a lot of these cases. I think it's a serious argument being made by counsel on the other side that there's also a serious question of guilt in this case. Regardless of most of these capital cases, it is the sentence. There really wasn't any mitigation case. So I don't know whose fault that was, but that is a serious effect, it seems to me, of this lack of functioning as partners of Malamud and Ben. Counsel, let me add one other dimension to that inquiry. Once we say that this is not on its face, it's not a chronic error. That is, he did have another lawyer. Then the question becomes whether he received ineffective assistance from that lawyer. Now, we just move away from the fact that the first lawyer was sleeping through the thing. You don't get structural error out of that. So now we just add our quote, what about the ineffective assistance of the lawyer that was there? Now, in that context, he did nothing with regard to mitigation. I mean, I won't be kind about that. What, 15 minutes, they put on two witnesses, and he relied on the witnesses of the others. Why isn't that, in and of itself, ineffective assistance? You would say, well, the Texas Court of Criminal Appeals really did not deny that, so we do it with indifference. What did the Texas Court of Appeals say about the focus of that? Because our question is whether he got effective assistance, counsel. And if we take out this whole issue of chronic and take this record up, go straight at it, then there are serious problems with the adequacy of that performance for the reasons that my colleague has suggested to you. So a couple of responses, Judge Higginbotham. The first is that I read the court's COA order. The Strickland claim was limited to pretrial preparation and cross-examination of witnesses. I didn't read it to be at the mitigation stage, so the court's review is limited in that respect on what it granted the COA on. Separately, though, to go directly to your question, on the mitigation claim, I mean, the CCA found that he put on witnesses, he attempted to obtain some of them. I mean, the testimony was from his wife, I believe, an individual at the Harris County Jail, and then one of his work supervisors. But the essential point, I think, is that I haven't seen anything that suggests a clearly established Supreme Court law that the CCA misapplied on that issue. I just don't see any case that suggests in this posture that's what happened. So, for that reason, the relitigation bar would bar granting of abuse relief on the Strickland claim. That's on the deficiency prong. Prejudice as well. So I don't see any argument that there would be prejudice here, that the likelihood of a different result is substantial. That's the Supreme Court in Harrington, not just conceivable. So, at the end of the day, I don't think there's any clearly established Supreme Court law that was misapplied by the CCA in the context of that mitigation claim. It's a different question. Two different questions. It sounds like your question is going to a de novo review question, but, of course, this is AEDPA, double deference, higher bar. So, and sticking with the Strickland claim, there were a couple of other points I think the court granted the COA on. There was the pretrial investigation and the so-called limitations. We spoke a minute about the limitations. Again, I think the CCA rejected, and this is at 753 of its opinion, the assertion that Millam had been paralyzed by blind deference to an unconscious lead counsel. That is evidence, I think, that is not clear error under D2, that the limitations weren't, in fact, limitations on his conduct at the trial. As well, Millam's choices regarding pretrial investigation, where he instructed the investigator to look for leads, that was, as the CCA found, a matter of strategy, and based upon his thought that the resources of the investigator could be best deployed in other ways, going to the crime scene, driving for ballistics report, seeing if there are other witnesses across the street at the other warehouse from where the crime was committed. So, again, these are not unreasonable applications of Strickland. I'd point the court to Harrington v. Richter, which contains a very fulsome description about what, about the right to counsel, the Strickland claim in the AEDPA context. Strickland permits counsel to make reasonable decisions that make pretrial investigations unnecessary. That's 106. Attorney need not pursue an investigation that would be fruitless. That's 107. And, ultimately, counsel's entitled to formulate a strategy that was reasonable at the time and to balance limited resources. Again, the CCA applied these principles fairly, reasonably, under Strickland, and especially under AEDPA's double deference with respect to a Strickland claim. That's on the deficiency prong. The same is true under prejudice. Again, the Supreme Court has said that prejudice is established where the likelihood of a different result is substantial, not just conceivable, and a reasonable probability is one sufficient to undermine confidence in the outcome. We're looking at applying our review standards to what the Court of Appeals did. The opinion from the first page, printed page, in the text in southwest quarter, refers to the November 17, 2004 adoption, I guess, of the findings and conclusions of the trial court on the writ application. Is that a separate document of any significance here, this November 17, 2004? I mean, I looked at the trial court's findings, which were basically the state court's offered findings, with some changes. I mean, there wasn't cursory trial judge, state trial judge I'm talking about. Did the Court of Appeals do anything on November 17, 2004 that we need to look at when it was adopting these findings? Are they not restated in the opinion of O5, or what's the difference between the two? I want to be sure I'm looking at the— So, to the extent that they adopted them, I'm looking here at the findings of the trial court. The state habeas trial court starts on page 5124 of the record. To the extent that the CCA was adopting them, the court would look through to those findings, if that's the last reasoned opinion of the state court. So, I think that was the case with respect to the Brady claim. And so— We talked about the same thing, ma'am. I'm just going to follow in what you're saying. The Court of Appeals decision we've been talking about of May 2005. The second paragraph says, in its findings of fact, trial judge noted that almost all the 23 habeas claims and all people I was talking about. On November 17, 2004, we adopted the trial court's findings and conclusions on claims 3 through 23 and denied relief. Is any of that relevant to what we're looking at today, what the Court of Appeals did a year or six months before the opinion? I believe that was an unreasoned opinion. I'd have to go back and look at that. Okay, you're not— Yeah, to the extent it's— It's a big case. A lot of things have happened. It looks like you're not too sure what that is, so I'm not going to press you here on it. I'll pursue it. To the extent it's unreasoned, I know the court would look to the state trial court findings, and that's, again, page 51— 51— 5124 of the record. Going next to the chronic claim, I know that the court spoke about that a little bit last time with my friend on the other side. On the chronic claim, the CCA did not unreasonably apply chronic in denying the ineffective existence of counsel claims, so it's barred by 2254d1. Ultimately, the issue is that there's no clearly established Supreme Court law applying chronic in this way where there's one counsel functioning, I think, as Judge Southwick and Higginbotham noted, Malamud did, was functioning as counsel at trial, and that alone is sufficient to defeat the chronic claim. This court essentially said as much in Hall v. Thaler in 2012, and so to extend chronic in this way would, I think, run afoul of Teague, and ultimately chronic, of course, applies when there's a complete denial of counsel, and it can't be said here, I think, that McFarland's counsel was totally failing to oppose the prosecution throughout the proceeding as a whole. That's Bell v. Cohn from the Supreme Court. The only case that I think my friend's raised on the other side is Powell v. Alabama, but that essentially stands for the proposition that the trial court can't appoint counsel at the 11th hour. That's not what happened here. Mr. Malamud was appointed months before the trial. Explain to me, why is chronic any less controlling here? And chronic was about a sleeping solo counsel. Here you've got a sleeping co-counsel, but why wouldn't the rationale of chronic apply any less squarely here? Well, Judge Willett, because one counsel was, in fact, operating, was, in fact, conducting the trial. So in chronic where you have one person who's not doing anything to test the prosecution's case to adversarial testing, here you do. You have Malamud who did that, who conducted, as I said, most of the cross-examinations, gave his opening, gave his closing. That's what takes this out of chronic. I'll go next to the Brady claim. Ultimately, the Brady claim involves no unreasonable application of Brady, and there's no unreasonable application of any clearly established law that inadmissible evidence is material under Brady. This court noted that was an unsettled question of law, and even my friends on the other side there, the Third Circuit case, Dennis, the en banc decision from 2016, even the dissent and the majority opinion seemed to realize it was an unsettled question then. So when you have an unsettled question of law in the circuit courts, it can't then be an unreasonable application of clearly established Supreme Court law. For that reason, it fails, but as Your Honors were speaking moments ago with my friend on the other side, the trial court also did find that there was no suppression here, and that was a fact finding. There was no what? I'm sorry? The trial court found there was no what? That there was no evidence suppressed. It made that finding. It's not challenged here in this habeas proceeding, and so it's presumed correct, absent, clear, and convincing evidence of the contrary. It does seem that there was some ambiguity in the trial record about that, but the CCA made a decision to the contrary, and I can point Your Honor to it. It was page 5159 and 5160 of the record. That's the state habeas trial court's findings, which were adopted by the CCA, and so that's the last reason decision on the Brady claim, and as Your Honors are pointing out, the applicant further fails to show that the state improperly withheld such evidence. That's an independent reason, but our principal reason for denying relief on the Brady claim is that there's no clearly established Supreme Court law that establishes in admissible evidences material on that. I'm just picking up on what counsel on the other side says in his briefing. The first paragraph in what you referred us to is specifically on Brady, and all it says there, I think, is that this is inadmissible evidence, and so there's no reason to turn it over. In paragraph 29, which I think you're referring to now, is a summary of both the grand jury testimony and other matters, the Crimestoppers tape or whatever it was, and something else maybe. Thus, the applicant fails to show that Burke's grand jury testimony or the Crimestoppers narrative constituted Brady. The applicant further fails to show the state improperly withheld such evidence or such evidence would have been favorable. I don't know whether that applies to both items or just to the Crimestoppers. How do we deal with that ambiguous statement by the trial court? Well, I'm not sure it is ambiguous. Let me say that it's ambiguous. How do we deal with an ambiguous fact finding? Well, I think that the ambiguous, the court would defer to that. Well, the court would, as a starting proposition, section 2254E1 requires the court to presume the fact findings are correct, and absent clear and convincing evidence of the contrary, that is fine. So I guess if it's ambiguous... I'm going to talk... You don't need to work on whether it's ambiguous or not. I just want to know how to deal with it. So anyway, you've given your answer. Yeah, I mean, ultimately, I do think the court's referring there to such evidence, and I think construing it fairly, it looks like it's referring to both pieces of evidence, the Crimestopper issue and the Brady one. So ultimately, though, I don't think the court needs to get into that, because our primary ground on Brady is that it's not a clearly established principle of Supreme Court law that inadmissible evidence is material for the Brady. So for that reason, the court should just deny the Brady. What about the exchange I was having with other counsel that it's not what's in the testimony itself, it's what that testimony might have led to, that if you looked at the grand jury testimony, if I understand what he was saying, it would have helped a more alert, fair counsel to pursue some other evidence, as opposed to the grand jury testimony itself was exonerative. Yeah, as I understand their argument, it's that the testimony itself would have helped to further impeach the testimony of Craig Burks. So the testimony, I believe, Walter Burks said he wasn't there at the confession. So yeah, I do understand them to be saying that it was for purposes of impeachment under Brady. I'll turn briefly to the Sixth Amendment issue, which hasn't got a lot of play here, but I'll address it as a sense of completeness here. On the Sixth Amendment issue, the CCA did not clearly establish any Sixth Amendment law. Ultimately, the habeas court held that the right to counsel attached only after the photo lineup. That was correct. The start of the adversarial judicial proceedings were only after the lineup, not before when an arrest warrant was issued. That's what they're pointing to. On the January 2nd issue, it was an arrest warrant, and there was an affidavit from an officer attached to it. That doesn't start the adversarial judicial proceedings. There's no clearly established Supreme Court law that says it does, and if anything, the Roth Gary case supports our position in that it talks about the Article 1517 magistration process in Texas starting the adversarial hearing. So the Sixth Amendment claim, in our view, is barred under AEDPA's new litigation. I'll turn to one more thing on AEDPA. There was an argument under Section 2254 D.2 that certain facts were unreasonably determined. Again, under Section E.1, the state court's determination of factual issues are presumed correct. The petitioner bears the burden of rebutting that with clear and convincing evidence. I think there was an argument about rejecting Walter Berks' testimony or calling him as a witness. That's a fact-finding that's presumed correct. Certainly, there was some hazy testimony in the record. Walter sort of maybe recommend... Sorry, Mr. Malamed maybe recalled such a conversation, and Mr. Farland suggested that he asked Mr. Ben to see what Walter had to say. Ultimately, that was a fact-finding that's presumed correct. I don't think that there's any clear and convincing evidence in the record rebutting that presumption of correctness. So the Strickland claim, trying to go through D.2, is barred as well under Ed Pizzoli Litigation Bar. At bottom, each one of these claims is barred under Ed Pizzoli Litigation Bar. Ultimately, the question for the court here is whether there has been any unreasonable application of any clearly established Supreme Court law by the CCA. There is no such evidence in this case. There's no such unreasonable application of Strickland, Cronick, Brady, or any Sixth Amendment case. And for those reasons, we'd ask the court to affirm. Unless there's any other questions, I'm happy to see the rest of my time. Thank you, Mr. Cole. First, Judge Southwick, you asked about the 2004 CCA order. I just wanted to clarify that that 2004 order is the CCA's order disposing of the Brady claim. Now, in that order, it adopts the trial court's findings, and by doing so, that makes essentially the trial court's findings the state court decision, the reason state court decision. It's a fairly simple order. A few sentences or whatever, we adopt those findings. I'm sorry. In November 2004, the Court of Criminal Appeals order was a fairly simple order, not any analysis, just we adopt the findings. Yes, and when the CCA adopts the findings, those become... that becomes the reason decision, essentially, of the state court for purposes of 2254D. I'd also like to briefly talk about the return to the chronic claim and the second lawyer's status, and the instruction to that lawyer that he was not to make any decisions absent the consent of both retained counsel and Mr. McFarland. That instruction essentially made him not a functioning co-counsel at all.  you know, had to consult a client on every decision that they made, the system would break down in effect, and I believe it's Taylor v. Illinois, the Supreme Court said the adversary process could not function effectively if every tactical decision had to be approved by a client. Now, Melamed at all times believed that his role was this limited one, that it was a backup to retained counsel, and that it was not his place to make strategic decisions. He consistently took, if you read his testimony, he took that duty seriously, or that limitation seriously. He testified it was not his place to do things like ensure Blondier questioning was thorough, or that the state's critical eyewitness was effectively impeached. And most importantly, he testified it was not even his place to protect Mr. McFarland, his Sixth Amendment right to counsel, by, for example, removing... moving to remove retained counsel. In fact, no record of retained counsel's neglect or sleeping was ever made by Melamed, who testified he never even thought about responding to any egregious failures by the trial, the retained counsel, because, quote, it was his case and I was not to do anything. Now, he also testified at one point, I was under his direction, his referring to the trial judge. There was obviously a conflict between subordinating myself to Mr. Ben, the retained counsel, and doing anything. Finally, he was asked what he felt like going... what his thoughts were after Blondier and going into the evidence phase of the trial, and he said, if someone appointed me, God, to say this person should have another lawyer, I would have done it. I tried to make the best of the situation and do what I could. Now, the situation that he is referring to here is precisely the constraints on his representation and that the third chronic test is meant to examine, to determine whether any lawyer could be expected to render effective assistance under them. Briefly, just a remainder, I want to touch on the Sixth Amendment line-up issue. Now, the re-litigation bar should not preclude federal review of the merits of that claim because, as we argued, the state court misapprehended the record when it overlooked the filing of a complaint on January 2nd, 1992 with a judicial officer that accused Mr. McFarland of committing a crime. Even if that mistake occurred, the print on the other side indicates there's no clearly established law. You cite some 60s Supreme Court opinions. There's not been much in play since then. What do you say to that? Sure. I think, actually, I agree with the counsel over here that Rothkering could be, is the decision that this court can rely on both for the EDPA determination and for any merits review. And Rothkering postdated the state court decision in this case, but it says that it merely reaffirmed its prior decisions. And Rothkering is helpful because it is a Texas case. And what Rothkering says is, the government's commitment to prosecute is sufficiently concrete when an accusation filed with a judicial officer prompts arraignment and restrictions on the accused's liberty to facilitate the prosecution. And as our brief argues, the January 2nd complaint, which was filed before the lineup, was such a commitment to prosecute. We request the court grant all of the relief we requested. Thank you. All right, counsel. Thank you both. You've been quite helpful in allowing us to understand this case better. We will take it under advisement. We are adjourned.